# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

BANGOR GAS CO., LLC,        )
        )
       Applicant,     )
        )
v.        )
        )   Civil no. 1:11-cv-457-NT
H.Q. ENERGY SERVICES     )
(U.S.), INC,        )
        )
       Respondent.   )

## ORDER ON MOTIONS TO VACATE / CONFIRM ARBITRATION AWARD

This case comes before the Court on Applicant Bangor Gas Co., LLC's ("**Bangor Gas**") motion to vacate in part and confirm in part an arbitration award disposing of its contract dispute with Respondent H.Q. Energy Services (U.S.) Inc., ("**HQUS**"). The arbitration award was entered by a three-member arbitration panel on September 1, 2011, (Doc. # 1-3) (the "**Award**"), and the panel entered an Order on Request for Clarification of the Award on September 23, 2011 (Doc. # 1-4) (the "**Clarification Order**"). Respondent HQUS requests that the Court confirm the Award. For the reasons that follow, the Court denies Bangor Gas's motion to vacate the Award in part and to confirm the Award in part, and grants HQUS's motion to confirm the Award.

## I.    Summary of the Dispute and of the Award

Bangor Gas operates a pipeline from Orrington to Bucksport, Maine (the "**Bucksport Pipeline**"). In 1999, Bangor Gas entered into an agreement with HQUS, a gas supplier, to provide transportation of HQUS's gas through the Bucksport Pipeline to a facility in Bucksport, Maine for a fixed sum of $1,150,662

per year for fifteen years. The gas originates in Canada, and is piped into Maine through a mainline operated by a third entity, Maritimes & Northeast Pipeline, LLC ("**Maritimes**"). The Bucksport Pipeline does not link up directly with the Maritimes mainline, however. It links up with a 410-foot lateral line off of the mainline, also operated by Maritimes (the "**Maritimes Lateral**"), and Maritimes has been charging Bangor Gas for use of this line since the beginning of Bangor Gas's agreement with HQUS.

In 2007, ownership of Bangor Gas changed hands and the new owners discovered that Bangor Gas's lease of the lateral line from Maritimes violated a Federal Energy Regulatory Commission ("**FERC**") rule requiring the shipper of gas to have title to the gas.[1] Bangor Gas paid a fine to FERC and then brought HQUS to arbitration in an attempt to get HQUS to reimburse Bangor Gas for the fine and the amounts Bangor Gas had been paying for use of the Maritimes Lateral. Bangor Gas also sought to have HQUS pay the cost of heating the gas to the 80 degrees Fahrenheit required under the contract as the minimum temperature for delivery of the gas to the facility in Bucksport.

The arbitration panel found that Bangor Gas was responsible for the cost of delivery through the Maritimes Lateral.  However, to comply FERC's "shipper must have title" rule, the panel directed HQUS to pay the cost of delivery through the Maritimes Lateral going forward and directed Bangor Gas to deduct that cost from the contractual amount HQUS owes Bangor Gas for delivery. The panel found that HQUS should be responsible for the cost of heating the gas once it arrived at the

---

[1] Whoever leases capacity in a pipeline is considered the shipper.

facility, but it did not award Bangor Gas any retroactive payment for gas-heating costs that Bangor Gas had borne prior to entry of the Award.

Following entry of the Award, Bangor Gas wrote to FERC requesting a "no action" letter regarding Bangor Gas's obligations under the award. Bangor Gas asserted that the Award's requirement that it rebate HQUS's cost of leasing the Maritimes Lateral also violates FERC rules. It then sought clarification from the panel. In the Clarification Order, the panel stated:

> We recognize Bangor's concern that in the unlikely event that FERC does, in fact, find that the referenced arrangements are not consistent with its policies, Bangor could theoretically be exposed to further penalties for violation of the FERC's rules… we hereby direct that HQUS promptly provide to Bangor written confirmation that it will return any reimbursement amounts it receives from Bangor, and will repay any capacity release payment amounts it credits against payments otherwise due under the Bangor/HQUS service agreement, to the extent necessary to comply with any finding by the FERC that the reimbursement and crediting arrangements are not consistent with FERC policy.

Clarification Order at pp. 4-5 (Doc. # 1-4). After the Clarification Order was issued, the FERC responded to Bangor Gas's request for a no-action letter, stating that the arrangements required by the Award would violate additional FERC rules requiring any purchase of capacity in a pipeline to either be at the maximum rate for the capacity, or to be subject to a posting and bidding requirement. If HQUS paid for capacity in the Maritimes Lateral at the maximum rate, this would be considered discounted by the rebate provided to HQUS by Bangor Gas, since the net price paid by HQUS would be considered less than the maximum rate for that capacity, and,

thus, posting and bidding would be required.  The response to Bangor Gas's request for no action concluded:

> Based on the facts and representations set forth in your letter, Staff is unable to assure Bangor that it would not recommend enforcement action to the Commission if Bangor engages in the subject releases in the manner described in your letter… this response only expresses Staff's position on enforcement action and does not express any legal conclusions on the questions presented. This response is not binding on the Commission and Bangor may file for a declaratory order if it chooses to seek relief from the Commission on these issues.

FERC Response to Bangor Gas's Request for No-action Letter (the "**FERC Letter**") at p. 5 (Doc. # 1-8).

Following this letter, Bangor Gas demanded that HQUS repay $297,547.50 it had rebated on its contract with HQUS since the award was entered, and brought this action to vacate in part and confirm in part the arbitration panel's award. HQUS has filed a cross-motion to confirm the award.

## II.   <u>**Standard of Review**</u>:

Under Section 9 of the Federal Arbitration Act ("**FAA**"), 9 U.S.C. §§ 1-16 (2009), the Court must confirm an arbitration award absent grounds offered for vacating, modifying, or correcting the award.  Under Section 10 of the FAA, the Court may only vacate an arbitration award:

**(1)** where the award was procured by corruption, fraud, or undue means;

**(2)** where there was evident partiality or corruption in the arbitrators, or either of them;

**(3)** where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any

other misbehavior by which the rights of any party have been prejudiced; or

**(4)** where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

Under this statute, a federal district court's review of an arbitral award is "extremely narrow and exceedingly deferential." *Bull HN Information Systems, Inc. v. Hutson*, 229 F.3d 321, 330 (1st Cir. 2000) (citing *Wheelabrator Envirotech Operating Services Inc. v. Mass. Laborers Dist. Council Local 1144*, 88 F.3d 40, 43 (1st Cir.1996). The First Circuit has elaborated:

> Indeed, "[a]rbitral awards are nearly impervious to judicial oversight." *Teamsters Local Union No. 42 v. Supervalu, Inc.*, 212 F.3d 59, 61 (1st Cir.2000). A court's review of an arbitration award is highly deferential because the parties "have contracted to have disputes settled by an arbitrator" and thus, "it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." *United Paperworkers Int. Union v. Misco, Inc.*, 484 U.S. 29, 37–38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). While the arbitrator's award must "draw its essence from the contract," as long as the arbitrator is "even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Id.* at 38.
>
> To determine whether an arbitrator has exceeded his authority under § 10, courts "do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts," *Id.* "Even where such error is painfully clear, courts are not authorized to reconsider the merits of arbitration awards." *Advest, Inc. v. McCarthy,* 914 F.2d 6, 8 (1st Cir.1990).

*Id.*

In the First Circuit, courts have the ability to vacate an arbitral award where it was made in "manifest disregard" of the law.  *See Bull HN*, 229 F.3d at 330-331

5

(citing *Advest*, 914 F.2d at 8).[2] The First Circuit has explained this "very limited" power of review:

> To establish such an exception, the challenger must show that the arbitration award complained of is: (1) unfounded in reason and fact; (2) based on reasoning so palpably faulty that no judge, or group of judges, could ever conceivably have made such a ruling; or (3) mistakenly based on a crucial assumption that is concededly a non-fact. McCarthy v. Citigroup Global Mkts., Inc., 463 F.3d 87, 91 (1st Cir. 2006). To succeed, there must be "some showing in the record, other than the result obtained, that the arbitrator[ ] knew the law and expressly disregarded it." Advest, 914 F.2d at 9.

*Ramos-Santiago v. United Parcel Service*, 524 F.3d 120, 129 (1st Cir. 2008).

## Discussion

Bangor Gas makes three arguments in its motion to partially vacate the arbitrators' award: (1) The arbitrators impermissibly relied on evidence not presented by the parties in determining who should be responsible for the cost of transportation over the Maritimes Lateral; (2) the arbitrators' decision regarding payment for the lateral line was made in manifest disregard of the law because it violates FERC's rules and requires Bangor Gas to expose itself to further action from FERC, and (3) the arbitrators' decision not to enter a retroactive award requiring HQUS to pay for costs of heating the gas from 1999 through the present violated the parties' contractual "no compromise" clause.

---

[2] The availability of this standard of review was called into question by the Supreme Court in *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 585, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008). In *Stolt Nielson, S.A. v. Animalfeeds Int. Corp.*, the Supreme Court stated, "We do not decide whether "'manifest disregard' survives our decision in *Hall Street* as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10." (internal citation omitted.) Because the Supreme Court has not expressly overruled this standard of review, and because the parties do not dispute that it should continue to be recognized within the First Circuit, the Court recognizes and employs it.

Bangor Gas also claims that it is entitled to reduce to judgment amounts it claims HQUS is required to reimburse to it in the wake of the FERC Letter. HQUS, for its part, requests confirmation of the entire Award. The Court reviews each of these claims in turn.

### 1.  Reliance on Evidence Outside the Record

Bangor Gas asserts that the arbitration panel engaged in misconduct under 9 U.S.C. § 10(a)(3) when it reached out to review certain documents relating to construction of the lateral pipeline which were not presented to the panel by the parties. Bangor Gas posits that the panel obtained these documents, which appear as attachments 1 and 2 to the Award (pp. 12-19 of Doc. # 1-3) from FERC's public records.

The First Circuit has not directly addressed the issue of whether relying on evidence not in the record may constitute misconduct sufficient to vacate an arbitration award. However, *Teamsters Local 312 v. Matlock, Inc.*, 118 F.3d 985, 995 (3rd Cir. 1997), cited by Bangor Gas in support of this proposition, recites a general standard in its discussion of the issue that has been adopted by the First Circuit. Under this standard, procedural irregularities may be grounds for vacating an award only if the result "so affects the rights of a party that it may be said that he was deprived of a fair hearing." *Hoteles Condado Beach, La Concha and Convention Center v. Union de Tronquistas Local* 901, 763 F.2d 34, 40 (1st Cir. 1985), *see also OneBeacon America Ins. Co. v. Swiss Reinsurance America Corp.*, 2010 WL 5395069, *7 (D. Mass, Dec. 23, 2010).

In *Hoteles Condado*, an arbitrator awarded compensation and reinstatement to a former hotel employee ("**Otero**") who had been dismissed by the hotel for allegedly indecently exposing himself to a guest. *Id.* at 37. The guest testified at Otero's criminal hearing for indecent exposure, but she refused to testify before the arbitrator in Otero's union's suit against the hotel for Otero's unjustified dismissal. *Id.* The arbitrator accepted into evidence a transcript of the guest's prior testimony, but then refused to give this transcript any weight in determining whether the hotel's dismissal was justified. It then entered an award in favor of Otero. *Id.* The First Circuit upheld the district court's decision vacating the award because:

> the arbitrator's refusal to ascribe any weight to the testimony given at the criminal proceedings effectively denied the [hotel] an opportunity to present any evidence in the arbitration proceeding… no other evidence was available to substantiate or to refute the [hotel's] charges that Otero had violated the rules regarding employment. The evidence effectively excluded by the arbitrator was both "central and decisive" to the [hotel's] position…

*Id.* at 40. By contrast, in *OneBeacon*, an arbitration panel's decision to limit discovery sought by one side regarding an alleged industry custom and practice and to limit the testimony of certain witnesses at the arbitration hearing did not constitute misconduct. 2010 WL 5395069 at *3-5. The federal district court for the District of Massachusetts noted that, while the hotel in *Hoteles Condado* was "precluded… from presenting any evidence at all…", "OneBeacon… had plentiful opportunities to present evidence, and what limitations the Panel did place on witness testimony were entirely within the bounds of its discretion." *Id.*

The limitation or exclusion of evidence from the record is different than the consideration of evidence not presented by the parties. There are often legitimate reasons for excluding or limiting evidence, but there are only limited legitimate grounds for considering evidence not presented by the parties.[3] However, the the First Circuit's analysis with respect to exclusion of evidence illustrates the magnitude of the procedural error required before a court can overturn an arbitration award. The effect must be such that it deprives a party of a fair hearing; it must relate to *central and decisive* evidence.

The panel evidently found the information contained in Exhibits 1 and 2 to the Award helpful to their interpretation of the parties' contract. However, the record does not support a conclusion that these attachments were central and decisive evidence in the case. Bangor Gas's assertion that the language of the contract unambiguously places responsibility for the Maritimes Lateral with HQUS in the absence of Exhibits 1 and 2 is undermined by the facts that the Maritimes Lateral is never mentioned in the contract, and that Bangor Gas paid for the Maritimes Lateral for the first several years of the contract without dispute. The panel considered the attachments to resolve an existing ambiguity in the contract.

Bangor Gas was also not deprived of the opportunity to present its side of the case. It was well aware of this central issue of contract interpretation, and, although it did not have an opportunity to address Attachments 1 and 2 in particular at the

---

[3] HQUS does not argue that the documents obtained by the panel could be recognized under judicial notice.

hearing, it was not otherwise prevented from presenting its best evidence and arguments to the panel in support of its interpretation of the contract.

Moreover, Bangor Gas has failed to point to any real prejudice arising from the panel's consideration of these documents. Bangor Gas makes no argument that the panel misconstrued Attachments 1 and 2 in a way that resulted in the panel's misinterpretation of the contract, nor did Bangor Gas raise this issue in its request to the panel for clarification of the Award. Absent a demonstration of prejudice, the panel's procedural irregularity in relying on evidence outside of the record is insufficient grounds for vacating the Award. *See* 9 U.S.C. § 10(a)(3) (requiring misconduct that prejudices the rights of the party to vacate an arbitral award.)

### 2.  Entry of an Award Exposing Bangor Gas to FERC Action

An arbitration award may be vacated under the "manifest disregard of the law" standard only "where an award is contrary to the plain language of the [contract]" or "where it is clear from the record that the arbitrator recognized the applicable law—and then ignored it." *Bull HN*, 229 F.3d at 330-331. As reviewed above, the language of the parties' contract is ambiguous with regard to who should bear the cost of leasing the Maritimes Lateral. Accordingly, the panel did not disregard the plain language of the contract.

There is also no indication that the panel ignored applicable law. To the contrary, the panel structured its original order in an effort to comply with FERC's "shipper must have title" regulations. The panel then modified the Award to require HQUS to repay Bangor Gas "to the extent necessary to comply with any finding by

the FERC that the reimbursement and crediting arrangements are not consistent with FERC policy." Clarification Order at p. 4 (Doc. # 1-4). The panel's Award and Clarification Order together display a good faith effort to recognize and comply with applicable law.

The FERC Letter, which was issued after the panel's decisions, does not alter this result, particularly given the letter's admonishments that it "does not express any legal conclusions on the questions presented…", that it "is not binding on the Commission…", and that "Bangor may file for a declaratory order if it chooses to seek relief from the Commission on these issues." FERC Letter at p. 5 (Doc. # 1-8).

In a somewhat separate claim, Bangor Gas requests that the Court "confirm" the Clarification Order by requiring HQUS to reimburse it at this time. Bangor Gas asserts that this letter constitutes a "finding" by the FERC that the Award's arrangements are not in compliance with FERC rules. Bangor Gas argues that the phrase "any finding" in the Clarification Order refers not only to orders on declaratory judgment but also to no-action letters. It points out that the panel implied in the Clarification Order that a no-action letter from the FERC would constitute a "finding."

The Court disagrees. The panel clearly thought that the FERC would give Bangor Gas the "no-action" assurances that it sought. The panel stated: "a decision by the FERC that the above-referenced reimbursement and crediting arrangements are not consistent with FERC policy [ ] is not at all likely to occur." A no-action letter would have allowed the Award's rebate arrangement to survive. However, the

failure to issue "no action" assurances does not equate to a "finding" by the FERC on the legal question posed. The FERC Letter states as much.

The FERC Letter does not state that the FERC will sanction Bangor Gas, it merely states that it is unable to ensure that the FERC will not take action against Bangor Gas. Bangor Gas must either seek a declaratory judgment from the FERC or await an enforcement action by the FERC. In either event, HQUS's repayment obligation is triggered only by a FERC order that finds the Award's reimbursement and crediting arrangements are inconsistent with FERC policy.

### 3. Failure to Award Retroactive Compensation for Costs of Heating Gas

Article XIII.2.c of the parties' agreement states:

> In the event that the arbitration requires a decision (i) as to the allocation or payment of any monetary amounts or valuations to be reduced to monetary amounts, or (ii) the methodology or accuracy of any calculation related thereto, the arbitrators shall select the position of that Party which the arbitrator believes most appropriate under the circumstances. No 'compromise' determination or alternate calculations shall be made by the arbitrator who is bound to adopt the position of one Party to the exclusion of the other on such matters.

(Doc. # 1-2.) Bangor Gas asserts that the panel's determination that HQUS should be responsible for the cost of heating its gas to 80 degrees Fahrenheit at the point of delivery required the panel to award retroactive payments to Bangor Gas under this "no compromise" language.

Interpretation of this language as part of the parties' contract is the province of the arbitration panel. The panel was aware of this paragraph, which it called the "baseball arbitration" clause, and it interpreted it as requiring only that the panel

not adjust or compromise the amount of the heater fuel charges during any particular period. *See* Award at p. 10, n. 4 (Doc. 1-3). In the panel's estimation, this clause did not require it to apply its interpretation of the contract language both retroactively as well as prospectively.

The panel's determination not to award retroactive payments to Bangor Gas may be in some sense a compromise determination, in that the contract does not provide for split payments, and therefore appears to contemplate that either one party or the other would pay for the cost of heating the gas. However, the panel's determination does not so clearly fall within the prohibitions of this clause as to require the Court to overturn it. The language in the clause that comes closest to requiring an all-or-nothing approach to these payments is "In the event the arbitration requires a decision as to the allocation… of any monetary amounts… the arbitrators shall select the position of that Party which the arbitrator believes most appropriate under the circumstances."

The Panel, however, distinguished retroactive payments from prospective responsibility for the cost of heating the fuel on two interrelated grounds. First, unlike responsibility going forward, retroactive payments would require difficult and contentious documentation and confirmation of past heater fuel costs, and second, Bangor Gas had up to the present dispute been supplying the heater fuel for HQUS. Thus, while the panel did determine that Bangor Gas should no longer be responsible for this cost, it found the question of whether it was entitled to retroactive payments qualitatively different than the question of whether it should

be relieved of this cost in the future. Now that Bangor Gas had raised the issue of who pays for heating the gas, HQUS no longer had the same expectation of continued payment by Bangor Gas that it used to have. In the panel's estimation, it was not "compromising" one allocation, it was making a decision as to the allocation of payment on two separate questions: past payments and future payments. Whether the Court agrees with this determination is immaterial. It is not contrary to the plain language of the contract and is therefore confirmed.

### 4.  Confirmation of the Award

Both parties cross move for confirmation of the Award, at least in part. HQUS requests that the Court confirm the Award in its entirety, and Bangor Gas requests that the Court confirm that portion of the Award (as stated in the Clarification Order) requiring HQUS to reimburse amounts Bangor Gas credited to HQUS prior to the FERC Letter. The Court has already determined that Bangor Gas has not obtained a finding from the FERC that the Award is inconsistent with FERC policy, and so denies Bangor Gas's motion to confirm in part the Award and Clarification Order. The Court grants HQUS's motion to confirm the arbitration award, also for the reasons stated above.

Both sides also request attorneys' fees for their efforts in bringing their petitions to the Court.

Article XIII.2.i of the parties' agreement states:

An arbitration award shall be final, conclusive, and binding on both Parties, and may be filed in any appropriate court for enforcement. In the event it is necessary to enforce such award, all costs of

enforcement, including reasonable attorneys' fees (for in-house counsel or outside counsel) shall be payable to the Party against whom such award is enforced.

(Doc. # 1-2.) For its part, the FAA states:

If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made.

9 U.S.C. § 9. These provisions of the contract and the FAA together indicate that the Court's role in confirming the award is not in itself "enforcement" of the award. Absent very limited grounds for vacating, modifying, or correcting the Award, the Court is required to confirm the Award once it is "filed". This requisite act on the Court's part merely creates an enforceable judgment. Even if the parties dispute the Award as part of the process of requesting confirmation, as they have in this case, such a dispute concerns the viability of the Award, and is in that sense not about "enforcement" of it. By tying attorneys' fees to "enforcement", the parties indicated that attorneys' fees were contemplated, not for arguments about the merits of their claims or of the Award. Rather, the parties agreed that attorneys' fees are only merited if one party is non-compliant with a confirmed Award and the other party is required to resort to post-judgment remedies *see e.g.* Fed. R. Civ. P. 69 (stating

procedures for execution on judgments). Accordingly, the Court awards no attorney's fees in this proceeding.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 1st day of March, 2012.